**POMERANTZ LLP**
Jordan L. Lurie, State Bar No. 130013
jllurie@pomlaw.com
Ari Y. Basser, State Bar No. 272618
abasser@pomlaw.com
1100 Glendon Avenue, 15th Floor
Los Angeles, CA 90024
Telephone: (310) 432-8492

*Attorneys for Plaintiffs and the Putative Class*

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| LINDA DRAKE and MIKE HESLOP, on behalf of themselves and all others similarly situated, | Case No.: 2:20-cv-01421-SB-PLA |
| Plaintiffs, | **SECOND AMENDED CLASS ACTION COMPLAINT** |
| v. | 1. Violations of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200; |
| TOYOTA MOTOR SALES, U.S.A., INC., | 2. Violations of California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, *et seq.*; |
| Defendant. | 3. Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*; |
| | 4. Violations of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/1, *et seq.*; |
| | 5. Fraudulent Concealment; and, |
| | 6. Unjust Enrichment |
| | **JURY TRIAL DEMANDED** |

Plaintiffs Linda Drake and Mike Heslop, (collectively, "Plaintiffs"), bring this action against Defendant Toyota Motor Sales, U.S.A., Inc., ("Defendant" or "TMS"), by and through their attorneys, individually and on behalf of all others similarly situated, and allege as follows:

## **INTRODUCTION**

1.      This is a class action lawsuit brought by Plaintiffs on behalf of themselves and a class of current and former owners and lessees of 2008-2013 Toyota Highlander vehicles ("Class Vehicles").[1]

2.      At all times relevant hereto, TMS distributed, marketed, sold, and warranted Class Vehicles containing one or more defects that cause the Vehicles' intermediate steering shaft to fail, thereby creating a clunk, pop, or knock-type noise when turning the steering wheel left or right that signals the drive shaft is on the cusp of prematurely and completely failing (the "Steering Shaft Defect" or "Defect").  The Steering Shaft Defect can manifest at any time, while Class Vehicles are parked or operated at highway speeds and requires repair to ensure Class members can safely operate Class Vehicles.

3.      The Defect is central to Class Vehicles' functionality. The steering intermediate shaft is a critical vehicle component that connects the steering wheel to the steering rack in Class Vehicles. The intermediate shaft transfers motion from the steering wheel to the rack, which in turn converts the rotational motion of the steering wheel into the linear motion needed to turn the wheels. The steering intermediate shaft thus is indispensable to vehicle operation: as the intermediate shaft fails, the vehicle becomes harder to turn and power steering features falter, making vehicles more difficult to drive and placing drivers, occupants and other motorists at a substantial and unreasonable risk of physical injury.

4.      As a result, the Steering Shaft Defect renders Class Vehicles unfit for their ordinary and intended purpose: providing safe and reliable transportation.

---

[1] Plaintiffs reserve the right to amend or add to the vehicle models included in the definition of Class vehicles after conducting discovery.

5.    TMS' New Vehicle Limited Warranty (NVLW) should have covered the repairs the Defect necessitates during the NVLW period. Yet even when Class members advise TMS during routine maintenance visits and the warranty period that Class Vehicles have manifested symptoms of the Defect and require repairs, TMS' authorized service technicians deny that the Defect exists and assert the cracking and popping sounds it creates are normal wear and tear. Only when applicable warranties have expired does TMS inform Class members that the Defect requires costly out-of-pocket repairs.

6.    TMS has known about the Steering Shaft Defect since at least 2008—long before it began to issue Technical Service Bulletins ("TSBs") informing dealers of the Steering Shaft Defect and proposing "fixes" at the customer's expense. But TMS never disclosed the Defect to Class members prior to purchase and continued to sell hundreds of thousands of defective Class Vehicles.

7.    Despite notice and knowledge of the Steering Shaft Defect from the numerous complaints it received from customers, repair data provided by its dealers, National Highway Traffic Safety Administration ("NHTSA") complaints, and its own internal records—including pre-sale durability testing—TMS has concealed the Steering Shaft Defect's existence, has not recalled Class Vehicles to repair the Steering Shaft Defect, has not offered customers a suitable repair or replacement free of charge, and has not offered to reimburse customers who incurred out-of-pocket costs to repair the  Steering Shaft Defect.

8.    In short, as a result of TMS' unfair, deceptive, and/or fraudulent business practices, current and former owners and/or lessees of Class Vehicles, including Plaintiffs, have suffered an ascertainable loss of money, property, and/or loss in value.  The unfair and deceptive trade practices TMS committed were undertaken in a manner giving rise to substantial aggravating circumstances.

9.    Had Plaintiffs and Class members known of the Steering Shaft Defect at the time of purchase, including the safety hazard posed by the Steering Shaft Defect and the cost of repair, as well as the strong likelihood that the Steering Shaft Defect would again

manifest following repair, they would not have purchased Class Vehicles, would have paid much less for them and would have avoided the expense of repairing their intermediate steering shafts (and, often, on more than one occasion).  As such, Plaintiffs and Class members have not received the value for which they bargained when they purchased their Class Vehicles.

10.    Accordingly, Plaintiffs bring this action to redress TMS' violations of various fraud statutes.

## JURISDICTION & VENUE

11.    This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332(d), the Class Action Fairness Act of 2005 because: (i) there are 100 or more Class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different States. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

12.    This Court has personal jurisdiction over TMS because it has conducted substantial business in this judicial district, and intentionally and purposefully placed Class Vehicles into the stream of commerce within this judicial district and throughout the United States.

13.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because TMS transacts business in this district, is subject to personal jurisdiction in this district, and therefore is deemed to be a citizen of this district.  Additionally, there are one or more authorized TMS dealers within this district, and TMS has advertised in this district and has received substantial revenue and profits from its sales and/or leasing of Class Vehicles in this district, including to members of the Class; therefore, a substantial part of the events and/or omissions giving rise to the claims occurred, in part, within this district.

SECOND AMENDED CLASS ACTION COMPLAINT

# PARTIES

## Plaintiff Linda Drake

14.    Plaintiff Linda Drake is a citizen of the State of California, and currently resides in Harbor City, California.

15.    On or around March 20, 2012, Plaintiff Drake purchased a used 2009 Toyota Highlander from DCH Toyota/Scion Torrance ("DCH Toyota"), an authorized Toyota dealer in Torrance, California, with approximately 37,000 miles on the odometer, for personal, family and/or household uses.    Vehicle Identification Number ("VIN"): JTEDS41A992081104.

16.    At that time, Plaintiff Drake also purchased an extended 100,000-mile warranty plan for her Class Vehicle for an additional $1,500.

17.    Prior to purchasing her vehicle, Plaintiff Drake test drove the vehicle, viewed advertisements for the vehicle, reviewed the vehicle's window sticker, and spoke with Toyota sales representatives concerning the vehicle's features, including standard safety features. Neither the test drive, the advertisements, the window sticker nor the sales representatives disclosed or revealed that the intermediate steering shaft was defective and susceptible to breaking down, and unable to withstand the wear and tear caused by normal and foreseeable use and operation.

18.    In March 2015, with 92,258 miles on her Class Vehicle, Plaintiff Drake noticed a harsh noise when shifting gears, and in some cases, her vehicle failing to shift entirely.

19.    On March 13, 2015, Plaintiff Drake subsequently contacted DCH Toyota to secure warranty coverage for her vehicle.  DCH Toyota refused her request, and instead claimed that the noise she heard could not be replicated and was simply caused by a "breaking in period" that would eventually pass.

20.    Plaintiff Drake again experienced the same harsh noises and gear-shifting issues with her vehicle in November 2015, and on November 12, 2015, brought her vehicle back to DCH Toyota.

21.    DCH Toyota then claimed that any issue with her Class Vehicle was caused by the vehicle's bushings, and that it would replace the bushings and fix any noises Plaintiff Drake heard.

22.    Plaintiffs Drake, knowing nothing about automobile repair, trusted DCH Toyota in its diagnosis of the problem she experienced and accepted the bushing replacement as a solution for the noise problem.

23.    When Plaintiff Drake picked up her Class Vehicle from DCH Toyota after DCH Toyota purportedly repaired the issue, Plaintiff Drake found that the hash noises and gear trouble persisted.

24.    On December 5, 2015, Plaintiff Drake again brought her Class Vehicle to DCH Toyota complaining of "harsh shift[s] between 2nd and 3rd gear," only to be told that DCH Toyota was unable to verify the condition and that no problem could be detected.

25.    During Plaintiff Drake's three visits in 2015 to DCH Toyota, she was prevented from discovering the Defect through DCH Toyota's constant attempts to hide the ball and blame something else for the issues she was experiencing, and then ultimately insisting that no problem could be found.

26.    Plaintiff Drake was not—and still is not—sophisticated about automobiles or automobile repair, and therefore trusted Toyota, who was a sophisticated party with superior knowledge about her Class Vehicle.

27.    Every time Plaintiff Drake raised a concern about her Class Vehicle, she was assured by Toyota—the sophisticated party with intricate knowledge of the Class Vehicle— that it had discovered the source of and had fixed the issues she was experiencing.

28.    Following her third repair attempt, Plaintiff exercised further reasonable diligence to discover if her vehicle suffered from a defect.  While Plaintiff is currently unable to recall specific dates and times, Plaintiff Drake called DCH Toyota multiple times between December 2015 and July 2017.  Each time, she spoke with Toyota employees regarding the noises that persisted in her Class Vehicle.  She recalls specifically speaking

with Toyota employee Jose A. Hernandez.  Every time Ms. Drake called DCH Toyota, she described the continuing problems with her vehicle, specifically, harsh noise when shifting gears.  Each time, she was told by Toyota employees that there was nothing that Toyota could do, that her Class Vehicle had no issues, and any noises she was hearing were the result of the internal components working with each other and was not the result of any problems or defects within her Class Vehicle.  Based on these communications from Toyota, Plaintiff was under the impression and believed that there was nothing wrong with her vehicle, and that there was nothing further that Toyota was willing to do to address the issues she raised with respect to her vehicle. Further, based on Toyota's representations to her, Ms. Drake was dissuaded from undertaking further investigations to determine if the symptoms that her vehicle suffered from were the result of a defect or wrongdoing by Toyota, because those representations led her to believe that there was nothing wrong with her vehicle.

29.    In spite of the many representations made to Plaintiff Drake between 2015 and 2017, on July 3, 2017, she again brought her vehicle in to DCH Toyota because it was still suffering from the same issues.  It was as that time, when the vehicle had 121,377 miles on it and was officially out of warranty, that DCH Toyota finally acknowledged and informed Plaintiff Drake that her intermediate steering shaft required immediate attention and needed to be replaced.

30.    DCH Toyota then quoted Plaintiff Drake a cost to replace the intermediate steering shaft of $1,100.

31.    Plaintiff Drake declined to pay the requested $1,100 to replace her intermediate steering shaft.

32.    Defendant, its agents, dealers, or other representatives did not inform Plaintiff Drake of the Defect's existence at any time either prior to or following her purchase.

33.    Plaintiff Drake has suffered an ascertainable loss as a result of Defendant's omissions and misrepresentations in connection with the Defect, including, but not limited to, out of pocket loss associated with repair or replacement of the intermediate steering

shaft and the diminished value of her vehicle.  Had Toyota refrained from making the misrepresentations and omissions alleged herein, Plaintiff Drake would not have purchased a Class Vehicle, would have paid much less for it and would have avoided the expense of repairing her intermediate steering shaft.

**Plaintiff Mike Heslop**

34.    Plaintiff Mike Heslop is a citizen of the state of Illinois and currently resides in West Chester, Illinois.

35.    On September 5, 2012, Plaintiff Heslop purchased a new 2012 Toyota Highlander from Continental Toyota, an authorized Toyota dealer in Hodgkins, Illinois for personal, family and/or household uses.   Vehicle Identification Number ("VIN"): 5TDBK3EH0CS174171.

36.    Prior to purchasing his Class Vehicle, Plaintiff Heslop test drove the vehicle, viewed advertisements for the Class Vehicle, reviewed the Class Vehicle's window sticker, and spoke with Toyota sales representatives concerning the Class Vehicle's features, including standard safety features. Neither the test drive, the advertisements, the window sticker, nor the sales representatives disclosed or revealed that the intermediate steering shaft was defective and susceptible to breaking down, and unable to withstand the wear and tear of operating an automobile under normal conditions.

37.    On February 28, 2017, with 55,582 miles on his Class Vehicle, Plaintiff Heslop noticed a harsh noise when turning the steering wheel.

38.    Plaintiff Heslop subsequently contacted Continental Toyota to secure warranty coverage for his vehicle while having his oil changed.

39.    Continental Toyota refused his request, and instead claimed that the noise he heard could not be replicated.

40.    Plaintiff Heslop mentioned the noise to Continental Toyota—which had persisted—again on or about December 10, 2018 while having his oil changed at 62,000 miles.   During that same visit to Continental Toyota, Plaintiff Heslop was told by a Continental Toyota representative that the issue was "probably the intermediate steering

-7-

shaft" and that they "always go bad" in that model year. Continental Toyota then told Plaintiff Heslop that because his Class Vehicle was out-of-warranty, he would be required to cover the cost of replacing the intermediate steering shaft.

41.    Plaintiff Heslop subsequently contacted TMS directly, who had Continental Toyota reach out to set up an appointment to look at the Class Vehicle. Continental Toyota then informed Plaintiff Heslop that despite having already informed him that the intermediate shaft had failed, TMS would require him to pay a diagnostic fee and cover any needed repairs. Plaintiff Heslop declined to pay TMS to diagnose and subsequently repair his vehicle.

42.    TMS, its agents, dealers, or other representatives did not inform Plaintiff Heslop of the Defect's existence at any time either prior to or following his purchase.

43.    Plaintiff Heslop has suffered an ascertainable loss as a result of Defendant's omissions and misrepresentations in connection with the Defect, including, but not limited to, out of pocket loss associated with repair or replacement of the intermediate steering shaft and the diminished value of his Class Vehicle. Had TMS refrained from making the misrepresentations and omissions alleged herein, Plaintiff Heslop would not have purchased a Class Vehicle, would have paid much less for it and would have avoided the expense of repairing his intermediate steering shaft.

**Defendant**

44.    Defendant Toyota Motor Sales, U.S.A., Inc. ("TMS," or "Defendant") and its affiliates are automobile design, manufacturing, distribution, and/or service corporations doing business within the United States, and design, develop, manufacture, distribute, market, sell, lease, warrant, service, and repair passenger vehicles, including Class Vehicles.

45.    TMS is a California corporation headquartered in Plano, Texas. TMS is the U.S. sales and marketing division of Toyota Motor Corporation ("TMC"), a Japanese corporation that designs and manufacturers vehicle for distribution and sale globally, including in the United States. TMS distributes and warrants Toyota parts and vehicles,

which are then sold through TMS' network of dealers.  Money received from the purchase of a Toyota vehicle from a dealership flows from the dealer to TMS.

46.    Upon information and belief, TMS communicates with TMC concerning virtually all aspects of the Toyota products TMS distributes within the United States, including appropriate repairs for pervasive defects, and whether TMS will cover repairs to parts and assemblies customers claim to be defective. TMS' decision not to disclose the Defect to Plaintiffs or the Class, or to cover repairs to the same pursuant to an extended warranty or goodwill program, was a decision based in part on information provided by TMC, as well as its own analysis of relevant data points particular to the United States market.

47.    TMS also oversees its National Warranty Operations (NWO), which, among other things, reviews and analyzes warranty data submitted by TMS' dealerships and authorized technicians in order to identify structural failure trends in vehicles. Upon information and belief, TMS dictates that when a repair is made under warranty (or warranty coverage is requested), service centers must provide TMS with detailed documentation of the problem and the fix that describes the complaint, cause, and correction, and also save the broken part in the event TMS decides to audit the dealership. NWO collects this information, makes it available to other Toyota divisions, and assists TMS in determining whether particular repairs—such as those made to Plaintiffs' Vehicles and Class Vehicles—are covered by an applicable TMS warranty or are indicative of a pervasive defect.

48.    TMS also designs, determines the substance of, and affixes to its vehicles the window stickers visible on every Class Vehicle it offered for sale at its authorized dealerships, including those omitting mention of the structural Defect and reviewed by Plaintiffs prior to purchasing their Class Vehicles. TMS controls the content of these window stickers; its authorized dealerships have no input with respect to their content. TMS is legally required to affix a window sticker to every vehicle offered for sale in the United States pursuant to the Automobile Information Disclosure Act of 1958, 15 U.S.C.

§§ 1231-1233, *et seq*. In fact, the Act specifically prohibits the removal or alteration of the sticker by anyone other than the ultimate purchaser prior to the sale of the car, including the dealership at which the vehicle is offered for sale.

49. TMS also developed the marketing materials to which Plaintiffs and the Class were exposed, owner's manuals, informational brochures, warranty booklets and information included in maintenance recommendations and/or schedules for the Class Vehicles, all of which fail to disclose the Defect.

50. TMS also employs a Customer Experience Center, the representatives of which are responsible for fielding customer complaints and monitoring customer complaints posted to Toyota or third-party Web sites, data which informs NWO's operations, and through which TMS acquires knowledge of structural failure trends in its vehicles.

## TOLLING OF STATUTES OF LIMITATIONS

51. Any applicable statute(s) of limitations have been tolled by TMS' knowing and active concealment and denial of the facts alleged herein. Plaintiffs and the members of the Class could not have reasonably discovered the true, latent nature of the Defect until shortly before this class action litigation was commenced.

52. In addition, even after Plaintiffs and Class members contacted TMS and/or its authorized dealers for vehicle repairs concerning the Defect, they were routinely told by TMS and/or through its dealers that the Class Vehicles were not defective and the drive shaft failure is a normal "wear" condition, despite the propensity of the intermediate steering shafts installed in Class Vehicles to break down from ordinary or non-existent stresses.

53. Based on the allegations above, Plaintiff Drake undertook a reasonable investigation and acted with reasonable diligence, once on inquiry notice, that wrongdoing by Toyota could be the source of her vehicle's troubles. In response, she was repeatedly and affirmatively told by Toyota that the issues experienced by her vehicle were *not* due to a defect and that there was nothing wrong with her vehicle. Based on the foregoing,

Plaintiff Drake could not have discovered her vehicle's defect until Toyota itself did so on July 3, 2017.

54.    TMS was and remains under a continuing duty to disclose to Plaintiffs and the members of the Class the true character, quality, and nature of the Class Vehicles, that the drive shaft failure results from a defect that it will require costly repairs, poses a safety concern, and diminishes the resale value of the Class Vehicles. As a result of TMS' active concealment, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## FACTUAL ALLEGATIONS

**Steering Assemblies within Class Vehicles**

55.    Until the 1970s steering systems consisted of a single, straight steel shaft—the steering column—that connected the steering wheel to steering gearbox, which contained the gears that transmit the driver's steering inputs to the steering linkage that turns the wheels. This structural configuration suffered from two significant limitations: (1) because the column consisted of a single shaft, steering wheels could only be mounted at one angle regardless of the driver's preferences; and (2) because the shaft was not collapsible, head on collisions often turned the column into projectiles that proved fatal to motorists.

56.    A collapsible shaft-in-shaft design resolved the safety risks the traditional single-shaft column posed and remained the design of choice until the 1980s when rack-and-pinion steering was introduced. A diagram of a tradition rack-and-pinion system is below.

///
///
///
///
///
///

-11-

57.    In a rack-and-pinion system, the steering gearbox is called a "rack" and is best described as a toothed bar located inside a metal tube. The pinion is a small gear or shaft located at the end of the vehicle's steering column that engages the rack. The rack is parallel to the front axle and moves left or right when the steering wheel is turned, aiming the front wheels in the correct direction.

58.    The rack, however, is mounted both in a different plane and angle than the steering column, which required manufacturers to develop a new column design whereby the upper portion of the column (which is connected to the steering wheel) and the pinion gear and rack are connected by an "intermediate" shaft.

59.    Intermediate shafts typically consist of a telescoping steel shaft that expands and contracts through a slip joint. A plunger-shaped "boot" separates the upper and lower portions of the intermediate shaft and serves as a firewall that protects the shaft's upper portion (and other internal components) from road debris, water and other pollutants. Two universal joints, or "U" joints, bookend the intermediate shaft and connect it to the upper segment of the steering column and the pinion gear,[2] respectively. The joints swivel as the shaft turns. Neither the intermediate shaft nor its constituent components require regular

---

[2] In modern vehicles, the intermediate shaft typically also attaches to a steering coupler that in turn connects to the pinion gear or shaft.

maintenance and are expected to last the life of the vehicle. A representative intermediate shaft is depicted below:



Intermediate steering shaft with 2 universal joints + length compensation

60.    Each end of the steering rack protrudes through the tube and is attached to a tie rod, which connects to the wheel's steering arm at the spindle. When a driver turns the steering wheel the intermediate steering shaft transfers that motion to the pinion gear, which in turn moves along the teeth of the rack, moving the rack itself, and, ultimately, the tie rods and the wheel. The shaft thus converts the rotational motion of the steering wheel into the linear motion needed to turn the wheels.

61.    The clunking, popping, and knock-type noises of which drivers like Plaintiffs and the Class complain when the intermediate steering shaft fails signals that the shaft cannot turn as intended. An intermediate steering shaft malfunctioning in this manner poses significant safety risks to drivers, occupants and other motorists, even if the shaft is unlikely to crack and prevent steering generally.

62.    When the shafts fail, it causes drivers to apply additional torque to the steering wheel to force a rigid shaft to turn past a resistance point, which can subsequently send vehicles veering too far in one direction or the other and increase the risk of an accident. A failed shaft also may impede the steering wheel, and thus the wheels themselves, from returning to their center position following a turn, which likewise may force drivers to overcompensate in order to avoid accidents or running off the road.

63.    Many newer vehicles, including Class Vehicles, also are equipped with a modified electric power assisted rack-and-pinion steering system (EPS) similar to that depicted in the image below:

64.     EPS systems consist of four major components: (1) the EPS control module, which collects data to determine whether steering assistance is required; (2) the EPS motor; (3) the reduction gear, which inputs power steering assistance to the rack assembly; and (4) a torque sensor, which monitors the driver's input and the EPS system's mechanical output.

65.     The system aids drivers by calculating the additional power needed based on the torque being applied to the steering wheel by the driver, the steering wheel's position and the vehicle's speed. The EPS motor then rotates the rack with an applied force that reduces the torque required from the driver.

66.     In addition to fulfilling its mechanical obligations, in vehicles equipped with EPS systems the intermediate steering shaft also must function as intended and expected in order for the EPS to operate: if the shaft cannot turn freely or feels obstructed, the EPS system may miscalculate the additional power needed and malfunction by providing steering inputs or adjustments in the wrong amounts or at the wrong times, endangering drivers, occupants and other motorists.

///

///

///

SECOND AMENDED CLASS ACTION COMPLAINT

**The Steering Shaft Defect Within Class Vehicles**

67.    The Toyota Highlander is one of TMS' most popular U.S. offerings. TMS sold approximately 630,000 2008-13MY Toyota Highlander vehicles, all of which come equipped with the same intermediate steering shaft and an EPS system.

68.    Like many of its vehicles, TMS emphasizes the Highlander's safety features, and TMS' brand-wide focus on vehicle safety, in marketing and promotional materials. For instance, in 2011 TMS issued a press release that, among other things, highlighted the safety accolades awarded to Class Vehicles.[3]

69.    TMS also emphasizes and represents to purchasers of Certified Pre-Owned (CPO) Class Vehicles, that TMS subjects CPO vehicles to an exhaustive 160-point Quality Assurance Inspection that certifies the vehicles as of good quality.

70.    Further, all Class Vehicles come equipped with safety features intended to enhance their marketability and induce customers to choose Class Vehicles over competitive offerings. By way of example, all Class Vehicles come equipped with electronic stability control (ESC) systems. ESC systems are safety features that improve vehicle stability, handling and safety by detecting and reducing loss of traction. Among other things, ESC systems detect a loss of steering control and automatically apply brakes to maneuver vehicles to their intended point, protecting occupants and other motorists.

71.    Due to a defect, however, the intermediate steering shaft installed in Class Vehicles fails for no discernible reason during normal and foreseeable driving conditions when it should not.

72.    Intermediate steering shafts do not require maintenance and are expected to last for the life of a vehicle. They should not, and are not expected to, fail at all, let alone at the rates at which Class members report.

---

[3] https://pressroom.toyota.com/new-toyota-advertising-campaign-reminds-consumers-why-its-the-best-selling-brand-america/ (last visited June 5, 2020)

73.     The first symptoms the Defect typically manifests are clunking, popping, and/or rattling noises when drivers turn the steering wheel. These noises indicate the intermediate steering shaft cannot turn freely.

74.     Class members whose shafts have begun to manifest the Defect thus often also report feeling a resistance point beyond which they cannot turn the steering wheel without applying additional torque, as well as a loss of handling and power steeling failure, all of which pose an unreasonable and unnecessary safety risk to Class members, their loved ones and other motorists.

75.     As explained above, Class members' complaints are consistent with the nature and effects of the Defect. Drivers whose shafts have failed often must apply additional torque to the steering wheel to force a rigid shaft to turn past a resistance point, which can subsequently send vehicles veering too far in one direction or the other and increase the risk of an accident. A failed shaft also may impede the steering wheel, and thus the wheels themselves, from returning to their center position following a turn, which likewise may force drivers to overcompensate in order to avoid accidents or running off the road.

76.     Because the Defect also impedes the intermediate steering shaft from moving as intended, the Defect can cause the EPS system equipped in Class Vehicles to malfunction. Class members whose Class Vehicles have manifested the Defect often report feeling unsafe handling their cars because the wheel feels too loose and, thus, unresponsive, a symptom of the Defect and its impact on the EPS system.

77.     Because of its role within the EPS system, the intermediate steering shaft also impedes the functionality of standard Class Vehicle safety features like ESC systems. ESC systems rely on data the EPS system collects, data the Defect renders inaccurate. The Defect thus affects vehicle safety features beyond the EPS system in addition to precluding Class Vehicles from providing safe and reliable transportation generally, as intended and expected.

78.     TMS, for its part, recognizes that the Defect affects vehicle functionality and poses a safety risk. For example, in November 2012 TMS recalled more than 600,000 Prius

vehicles due to a failure in the intermediate steering shaft. The Defect Report TMS submitted to the NHTSA acknowledges that failures in that shaft that require drivers to overcompensate to return steering wheels to their full-lock position during operation "may cause an increased backlash" and pose a safety risk.[4]

79.    TMS also has recalled vehicles to repair defects that, like the Defect here at issue, impair power steering systems: in March 2015 TMS recalled, *inter alia*, certain 2015 Highlander vehicles due to a defect that could cause the EPS system to fail, which "results in increased steering effort at low vehicle speeds and increases the risk of a crash."[5]

80.    The Defect is covered by TMS' New Vehicle Limited Warranties, which cover in all Class Vehicles all repairs required as a result of defects in material or workmanship for three-years or 36,000 miles (whichever comes first). But the majority of Class Vehicles manifest the Defect only after any applicable TMS warranties have expired—and often at time periods and mileages *just* outside the warranty period—and TMS charges in excess of $1,000 (plus additional money to run a diagnostic test before any repairs can take place) to return the steering shaft to working order.

81.    But even where Class members tender their Class Vehicles for repair within the warranty period, TMS has often made only temporary repairs or denied any Defect exists, thereby denying any remedy under the warranty. Many Class members report receiving warranty coverage when the Defect first manifests, only to later discover the repairs were not an effective remedy and that they would be required to pay out-of-pocket for subsequent repairs. Moreover, Class members have reported that they have been denied warranty coverage by TMS claiming that no Defect can be identified, only to later be told that their Class Vehicles were, in fact, in need of a repair once their Class Vehicles were outside the applicable warranties, thus requiring Class members to pay out-of-pocket for any repairs. This causes TMS' warranties to fail of their essential purpose.

///

---

[4] Nov. 14, 2012, Part 573 Safety Recall Report 12V-537 (attached hereto as **Exhibit A**).
[5] Mar. 11, 2015, Part 573 Safety Recall Report 15V-144 (attached hereto as **Exhibit B**).

**TMC and TMS' Failed Efforts to Cure the Defect**

82.    TMC purportedly made changes to the composition and/or design of the intermediate steering shaft equipped in Class Vehicles on at least *two* occasions in an effort to permanently resolve the Defect, and TMS was knowledgeable about and played a part in those efforts.

83.    On February 21, 2013, TMS issued TSB No. 0034-13. TSBs are issued after automobile manufacturers and/or distributors open an investigation into a potential defect, compile their findings, draft a proposed remedy for internal review and then ultimately issue a finalized TSB to dealers. *In re MyFord Touch Consumer Litig*., 46 F. Supp. 3d 936, 958 (N.D. Cal. 2014) (observing TSBS are preceded by "an accretion of knowledge by [the manufacturer]." Courts have held that 16 months is a reasonable time period for a manufacturer to investigate and issue a TSB in response to a defect. *Butler v. Porsche Cars N. Am., Inc.*, No. 16-CV-02042-LHK, 2016 WL 4474630, at *5 (N.D. Cal. Aug. 25, 2016) ("The TSB's relevance to the issue of GM's knowledge is even more compelling in the instant case, where only eight months elapsed between the date of sale of Plaintiff's car and the release date of the TSB, compared to Philips, which had a gap of 16 months between the date of sale and the date of the TSB. It is reasonable to infer that, in order for TMS to release the TSB addressing the defect only eight months after the date of sale, TMS had knowledge of the defect by at least May 2007.").

84.    Through the above-referenced TSB,[6] TMS informed its authorized dealers and technicians that Class Vehicles "may exhibit a clunk, pop or knock-type noise when turning the steering wheel left or right[,]" and advised that "a new intermediate shaft has been developed to address this condition." Although TMS claimed the intermediate steering shaft was "new," it did not change the part number: 45220-48170.

85.    TMS' remedial efforts apparently fell short. Four years later it was forced to acknowledge that the "new" intermediate steering shaft released in 2013 did not resolve

---

[6] A copy of TSB No. 0034-13 is attached hereto as **Exhibit C**.

the Defect. On April 26, 2017, TMS revised TSB No. 0034-13[7] to inform authorized dealers and technicians it had yet again developed a "new" intermediate steering shaft to cure the Defect. TMS identifies the new shaft, the only intermediate steering shaft presently available for Class Vehicles, using part number 45220-48171.

86.    The intermediate steering shaft referenced in the April 26, 2017 TSB differs materially from the component originally equipped in Class Vehicles. Below is a photograph comparing the "old" and "new" shafts:



87.    As the photograph above demonstrates, the "shaft" itself is significantly thicker in the "new" part. The thicker shaft allows the intermediate steering shaft to withstand greater levels of torque and twisting without falling out of balance, developing

---

[7] A copy of the April 26, 2017 version of TSB No. 0034-113 is attached hereto as **Exhibit D**.

resistance points beyond which it cannot turn, and ultimately failing to function as intended and expected.

88.    In light of TMS' repeated efforts, however, neither Plaintiffs nor Class members can be certain that this latest "new" part will permanently resolve the Defect or similarly fail after only a few years use.

89.    Despite its longstanding knowledge of the Defect, TMS failed to inform Plaintiffs and Class members about the Defect both at the time of purchase and when they brought their Class Vehicles into authorized Toyota dealerships complaining about issues caused by the Defect.

90.    Adding insult to injury, TMS, despite knowing of the Defect, requires Class members to first pay for a diagnostic assessment, often costing hundreds of dollars, before it will even acknowledge the existence of the intermediate steering shaft failure, not to mention repair it.

**TMS' Knowledge of the Defect**

91.    TMS has known since before Plaintiffs and Class member purchased Class Vehicles that the intermediate steering shafts installed in the Class Vehicles were defective and prone to failure.  Indeed, the Internet is replete with examples of blogs and other Websites where consumers have complained of the exact same Steering Shaft Defect within the Class Vehicles. Moreover, TMS issued *two* Technical Service Bulletins ("TSB") that acknowledged the Defect and detailed potential repairs. Upon information and belief, TMS, through (1) records from the National Highway Traffic Safety Administration ("NHTSA"), (2) its own records of customers' complaints, (3) dealership repair records, (4) warranty and post-warranty claims, (5) internal durability testing, and (6) other various sources, was well aware of the Defect but failed to notify consumers of the nature and extent of the problems with the intermediate steering shafts installed in all models Class Vehicles, or provide any adequate remedy.

92.    At all times relevant to this litigation, TMS has concealed the Steering Shaft Defect from Plaintiffs and Class members. In furtherance of this deceitful course of

conduct, TMS, through its agents, concealed the true nature of the Defect by informing Plaintiffs and Class members that the premature failure of their intermediate steering shafts was the result of normal wear and tear.

**A.    Complaints Lodged with NHTSA.**

93.    There exist a large number of relevant customer complaints, many of which indicate TMS was made aware of the Steering Shaft Defect when affected vehicles were submitted for service, on the NHTSA Office of Defect Investigations ("ODI") Website, www.safercar.gov, as well as other customer forums and blogs addressing car defect and safety issues.  Yet, TMS has neither taken any steps to recall the Class Vehicles and repair the Steering Shaft Defect, nor to reimburse customers who have incurred expenses in connection with repairing the Steering Shaft Defect.

94.    Federal law requires automakers like TMS to be in close contact with NHTSA regarding potential auto failures, including imposing a legal requirement (backed by criminal penalties) compelling the confidential disclosure of structural failures and related data by automakers to NHTSA, including field reports, customer complaints, and warranty data.  *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).

95.    Automakers have a legal obligation to identify and report emerging safety-related failures to NHTSA under the Early Warning Report requirements. *Id*. Similarly, automakers should and do monitor NHTSA databases for consumer complaints regarding their automobiles as part of their ongoing obligation to identify potential defects in their vehicles, including safety-related defects. *Id*.  Thus, TMS knew or should have known of the many complaints about the Steering Shaft Defect logged by NHTSA ODI, and the content, consistency, and large number of those complaints that alerted, or should have alerted, TMS to the Steering Shaft Defect.

96.    The following are but a few examples of the many complaints concerning the Steering Shaft Defect available through NHTSA ODI's Website, www.safercar.gov. The complaints reveal that TMS, through its network of dealers and repair technicians, was made aware of the Defect. In addition, the complaints indicate that despite having

-21-

knowledge of the Steering Shaft Defect and the exact vehicles affected thereby, TMS and
its agents continue to neither disclose the Steering Shaft Defect, nor agree to make repairs
under warranty, as required by TMS' New Vehicle Limited Warranty. The comments
reproduced below are but a sampling of available complaints:

| Model Year | Complaint Date | Comments |
|---|---|---|
| 2008 | 9/30/2008 | There is a "Clicking Sound" in the steering column, especially when the car is in motion, and worse if turning the steering wheel while going over a bump. Feels as if something is loose in the steering system. Almost feels like a loose cv joint. This has been going on since I picked the car up from the dealer. The dealer tells me that this is a "characteristic of the vehicle." Problem has been persisting, and I showed this to another dealer, who told me that Toyota knows about the problem, and is working on it. Spoke with Toyota, who denied any knowledge, but offered a factory representative to meet with me and to test the car. Awaiting my appointment with Toyota factory representative. |
| 2008 | 3/29/2010 | I have a 2008 Highlander Hybrid and ever since a few hundred miles, there has been a knock in my steering wheel. It is intermittent, but mostly happens when the car is coming out of a turn, usually a right turn. As the wheel comes back to center (turning counter-clockwise) there a momentary knock which is audible and can be felt through the steering wheel. My dealer initially replaced the intermediate steering shaft after I noticed many people on the Toyota Forums reporting the same problem. At any rate, the problem came back after 500 miles of the 1st repair. I recently took the car in again, as the problem persisted and I felt had gotten worse. After a week of arguing with lame service dept manager (Marina Del Rey Toyota), I turned up the heat and spoke with the manager of the dealership. The part was replaced again, and after one week, the problem has returned. |

-22-

| 2008 | 9/18/2012 | The Contact owns a 2008 Toyota Highlander. The Contact state that while driving 10 MPH, the Contact heard a knocking sound in the steering wheel and the vehicle began to shake abnormally. The vehicle was taken to a dealer for diagnosis and a repair was made however, the Contact was unaware of the nature of the repair. After leaving the dealer the vehicle began to shake again. The vehicle was taken back to dealer at least three times who then advised that they were unsure of what was causing the failure. The vehicle was not further repaired. The failure mileage was 21,000 and the current mileage was 60,000. |
|------|-----------|---|
| 2010 | 12/10/2013 | Three times reported feeling a rattle in the steering on right turn ln rough road to Toyota service dept. three times they deny saying 3 people ( including service manager) drove it and didn't feel anything. I told them that when there's more weight on the front end, like braking downhill and turning right can feel it more. But the tested on flat ground in the area of motor imports downtown Honolulu. I even reported in earlier servicing that the car drifts from side to side on the freeway. As if the steering is loose. And they test drove and said it was fine. This is the last day of my warranty and I googled the problem to find others with the same problem and even a diagram on the fix |
| 2012 | 5/25/2014 | The vehicle developed a clicking feel in the steering system about a year and 9 months from manufacture date. Toyota dealership diagnosed problem as a failed intermediate steering shaft and recommend indicate replacement. I contacted Toyota as I feel repair should be covered by company due to nature of failure and age of vehicle. They haven't offered anything in way if assistance and have no recall pending even though this seems to be a serious problem across the whole Toyota vehicle line up. |
| 2012 | 8/23/2014 | Our car makes a clicking noise in the steering column when u turn to the right. It is very |

| | | |
|---|---|---|
| | | noticeable and loud. This concerns me as the safety of my family is very important. |
| 2012 | 11/7/2015 | Klunk sound and feeling in steering wheel started around 48,000 mile at 51,000 told by dealer the intermediate steering shaft needed replacing. This seems to be and ongoing problem with Toyota cars |
| 2011 | 5/27/2015 | When making a right hand turn the steering system has a significant "bump" [or] "thump". This appears to be a problem with a part of the steering sector shaft that Toyota is well aware of but will not acknowledge there is a problem with design. Toyota will only correct problem if customer is willing to pay cost of approximately $1200. Not sure what will happen if correction is not made, but I believe it could lead to failure of the steering system to function appropriately. |
| 2013 | 9/7/2016 | Steering TSB by Toyota: while driving vehicle and turning corners, I felt popping clunking noise in steering wheel. Sometimes made steering wheel vibrate. Instead of just a service bulletin, this should be a recall since Toyota has re-designed the failing component. Took vehicle into dealer to have fixed. Would have paid full repair price but was able to negotiate a discounted price for vehicle with only 52,000 miles. Component should have easily lasted over 125,000 miles. May be the same as your 10075792 record. |
| 2010 | 10/25/2017 | When turning steering wheel a clicking noise is heard. There is a TSB out on this problem. While vehicle is in motion a noise was heard, and a loud humming noise is coming from the rear. Vehicle was inspected to find problem and differential assembly need to be replaced. There is a TSB out on this problem. |
| 2010 | 6/4/2017 | I bought my Highlander used in March 2016. The car has had a clunking noise since I bought it but I didn't know it was a known issue with Toyota. I bought an extended warranty but of course it doesn't cover the defect. I am very upset because I |

SECOND AMENDED CLASS ACTION COMPLAINT

| | | |
|---|---|---|
| | | have paid for a warranty that doesn't fix what is wrong with the car. I also feel like it falls on the dealership and they should have fixed it before selling. Even though it is not considered a safety issue I don't want it to become a safety issue in the future. I don't feel like I should have to come out of pocket $650 to fix an issue that is known with the manufacturer. |
| 2010 | 6/28/2018 | Poor intermediate steering shaft assembly! Popping noise with clunking feel in steering wheel when turning at slow speeds and hitting bumps. Began around 60,000 miles and has progressively gotten worse (now at about 102,000 miles) took in at onset and told it's the intermediate steering shaft assembly. As it's getting worse, it's starting to feel very unsafe. This looks to be a very frequent issue when looking into it online. Don't understand how this is not a recall! My family is trusting Toyota and NHTSA to make correct decisions for our safety! |
| 2010 | 1/2/2018 | Steering has popping and clicking when turning from a stopped position. The steering has always sounded like it's straining/hard to turn. Popping gets worse and more frequently. It should be recalled like it has on other Toyota models that have resulted in steering failure. Intermediate shaft is faulty on many Toyota Highlanders but no recall has been issued. For 2010 model year. |
| 2013 | 2/12/2018 | There is a clunking noise when turning at low speeds. My mechanic says there is a defect in the design of the steering shaft. He said this commonly occurs with this model highlander, something supported by numerous complaints about the same issue. Toyota denies responsibility and won't issue a recall, though it is a safety risk. |

## B.    Other Customer Complaints

97.    In addition to complaints made directly to TMS by customers who tendered their vehicles to TMS' authorized dealers for repair, TMS routinely monitors the Internet,

including Toyota-specific forums, for complaints similar in substance to those quoted below.  Upon information and belief, TMS' Customer Service carries out this function and regularly receives and responds to customer calls concerning, *inter alia*, product failures.  Through these sources, TMS was made aware of the Steering Shaft Defect.  The complaints from carcomplaints.com, some of which are included below, also indicate TMS' awareness of the Defect and its potential danger, and many evidence Class members' efforts to contact TMS directly concerning the Steering Shaft Defect.

| Model Year | Complaint Date | Comments |
|---|---|---|
| 2008 | 05/04/2009 | My steering wheel it making noise all the time when you turn left or right its clicking when I went to Toyota dealer they asked for $3000 for repair and I have that clicking the year after I buy this car. |
| 2013 | 12/14/2012 | While turning the suv at slow speeds, I can feel a light klunk in the steering. It feels like a rotating part keeps running into an obstruction, so it goes klunk klunk klunk... a couple of times as long as the steering is rotated.<br><br>This happens mostly when the car is cold and the road is uneven, for e.g. turning while coming out of a subdivision in the morning.<br><br>Showed the car to 2 different dealers but both did not find anything and sent me back. I even drove around with one of the service techs and he did not feel any klunk. Perhaps the car was warm by the time I got to the dealership (25mi away). The service tech said that reporting to him has added a record of the problem and in case there is a TSB, they will let me know. He did not find anything wrong with the steering assembly (visual inspection) and suggested returning if it got worse or repeatable.<br><br>Have heard this from many other people on toyota forums but no fix from toyota. I had a corolla and |

| | | have a camry and have zero issues with those cars. I expected more from a 33000 car. |
|---|---|---|
| 2010 | 9/1/2013 | Turning when the road is bumpy causes a noise in the steering, and it can be felt in the hands at the same time. I tried researching, found pictures of a pin, possibly breaking later and causing failure. I had the Main Toyota guy Cameron test drive with me and of course, we couldn't duplicate it then, at the 3 year mark. But its 5 years and it's getting a little more annoying. |
| 2012 | 10/31/2013 | So about two weeks ago, I hear a low toned clunk noise while I turn the steering wheel. A couple days later, I hear it again and its gotten louder. The noise gets louder and occurs more frequently. I asked a mechanic from the Toyota service department, who is also my neighbor, if he knows about this problem. He tells me that its a common problem with the 2012 Highlander Steering shaft assembly, and that they have done quite a few replacements but its not a recall-bummer!!!!! Armed with this knowledge, I scheduled the car for service with the dealer, bringing it in and I asked to speak to the service dept. manager. I tell him how dis-satisfied I am and ask him if this was a common problem. He says, "no,I've never heard this complaint before". They proceed to replace the exact part that my neighbor said was the common problem and tell me that if it wears out again, to bring the car back and they'll continue to replace it under warranty until the warranty expires in three years. WHAT HAPPENS IN YEAR 4,5,6 AND SO ON ? Does anyone with a 2012 Highlander have the same problem with the steering and transmission ? |
| 2011 | 2/26/2014 | Took SUV to Florida Toyota dealer to report the noise while on vacation. Dealer said everything tight. August 2016 noise is more frequent and noticeable. Will have my Ohio dealer look at vehicle. Other owners suggest that the intermediate shaft is suspect …. I detected the noise shortly before buying this certified SUV and reported it to a |

| | | |
|---|---|---|
| | | dealer while the vehicle had low miles. The noise got worse so I took it back to the dealer at 70,000 miles. The noise was coming from the intermediate steering shaft and seemed to be more noticeable driving low speeds left or right off a driveway apron at the conclusion of a turn. The sound a single soft clunk that is felt in the steering wheel. Put a 275 pound technician in the driver's seat for a test drive and the noise goes away. But Toyota and I know the component was defective and reported in a timely fashion. There was a technical service bulletin regarding the symptom and proper repair in 2012. Ultimately the dealer offered to replace the shaft for a $100 deductible due to the vehicle being out of warranty. My point was that the component was noisy and was reported while under warranty. It is not my problem that the first dealership was deaf to my concerns. I am out $107.25 and four visits to Toyota dealers. |
| 2011 | 6/1/2014 | Took it to the dealer repair shop and asked them what was causing the noise while it was still under warranty. Repair manager said he couldn't find anything wrong. Took it back around 85,000 – louder and more noticeable, manager crossed through complaint, again, didn't know what I was talking about. Took it in this week at 106,000 and guess what? YEP, discovered the problem and want $700 to fix it. I showed him the ALL DATA TSB and I was told since it isn't a recall, they won't fix it unless I pay for it. |
| 2008 | 08/01/2014 | The contact owns a 2008 Toyota Highlander. While turning the steering when in either direction, a popping noise emitted from the steering column. The vehicle was taken to the dealer who diagnosed that the intermediate steering shaft was faulty and needed to be replaced. The vehicle was repaired and the failure was remedied. The manufacturer was notified of the failure. The failure mileage was 70,000. |

SECOND AMENDED CLASS ACTION COMPLAINT

| 2013 | 02/05/2015 | The steering column is making a thunking-type of noise when turning, usually at low speeds, around corners (not slight turns, such as when the road changes on the freeway). It's been documented in my records at least since 30,000 miles, just out of Toyota's warranty period. The car dealer reported that they were unable to duplicate the issue at the 30,000 service, as documented. It wasn't happening as frequently then, but now at 60,000 miles, it's constant. It seems to be related to the steering shaft/intermediate steering shaft. There appears to be a service bulletin from the manufacturer, but no further investigation/research presented. Since I am aware of what part is failing, I want to get it fixed, as I've read that this part, if it fails, could cause the car to fail, but don't want to pay money for a part that is considered defective. |
| 2012 | 8/18/2015 | Progressively worsening clunking/clicking noise/feel in the steering when you turn the steering wheel to the right or left. Notice at all speeds but more pronounced at lower speeds. Dealer noted that Toyota has an internal memo on this issue, but to date has not issued a recall. According to the dealer, the memo identifies the problem as the intermediate steering shaft and that Toyota has corrected the issue with a new/replacement part. Estimated cost from dealer is approximately $500. |
| 2012 | 11/20/2015 | There is a noise in the steering column when I turned left or right and something the steering shake. Toyota should have make a recall on this problem because it must be potentially dangerous. I have to bring in to repair soon and the cost gone be probably clause to 700$. |
| 2013 | 02/08/2016 | Toyota 2013 Highlander with 31237 miles had to replace the steering shaft due to thud-thud noise when turning right or left. I bought car new from dealership. Car still under warranty but was told it will probably happen again. Parts and labor estimated to be $500+ each time in the future. According to information on internet this is not a |

SECOND AMENDED CLASS ACTION COMPLAINT

| | | random issue with Highlanders and has been going on for some time. This appears to be a design flaw that is being ignored with the owner being required to foot the bill. Never had a steering shaft issue in the cars I have previously owned some for over 100,000 miles, U.S. made or non-U.S. made models. The new part is guaranteed for one year...that is not acceptable for a known reoccurring issue of which Toyota is aware. I called Toyota national customer relations in torrance, ca and spoke with representative who was very polite but offered no recourse for this issue. Very disappointed. |
|---|---|---|
| 2008 | 07/25/2016 | The contact owns a 2008 Toyota Highlander. Every time a turn was made, the steering shaft made a noise. The failure has occurred ever since the vehicle was purchased in July of 2016. The dealer diagnosed that the shaft assembly failed and needed replacement. The vehicle was not repaired. The manufacturer was notified of the failure, but vehicle exceeded the mileage to be repaired under technical service bulletin: 0034-13. The approximate failure mileage was 106,000. |
| 2011 | 12/28/2016 | Clicking sound when turning left and clunking sound in steering when driving over bumpy road. Not a mechanic here but based on my research on YouTube and Toyota nation, I'm thinking the issue is a failing CV joint. Now I'm looking for a mechanic who specializes in this type of work. Leaning toward a local tire store who also does brakes and shocks. |

98.    Similar complaints can be found on the website, ToyotaNation.com, which is a forum for fans of Toyota vehicles, and have noted that the steering shaft issue has been a

-30-

persistent problem in 2004-2007 Toyota Highlander models, and the existence of TSBs for those 2004-2007 models demonstrates that TMS has long known about the Defect.[8]

### C.    TMS' Knowledge of the Defect from Previous Highlander Models

99.    TMS also knew or should have known about the Defect because the steering shaft that is used in Class Vehicles is substantially similar/the same as the steering shaft used in its 2004-05 Toyota Highlander and 2006 Toyota Highlander HV vehicle models.

100.    On September 16, 2008, TMS issued a TSB detailing near identical problems in 2004-05 Toyota Highlander and 2006 Toyota Highlander HV vehicle models as customers have found in Class Vehicles.[9]

101.    Owners of 2004-05 Toyota Highlander and 2006 Toyota Highlander HV vehicles models experienced the same symptoms of "clunk, pop, or knock type noises when turning the steering wheel left or right," as Plaintiffs and Class members experienced when encountering the Defect in the Class Vehicles.

102.    Due to the nature of the complaints concerning near identical symptoms of the Defect in earlier Highlander vehicle models—highlighted by its own TSB—TMS knew or should have known of the Defect prior to placing Class Vehicles into the stream of commerce.

### D.    Other Sources of Knowledge

103.    TMC is experienced in the design and manufacture of consumer vehicles. TMC and its manufacturing affiliates in the United States likely conduct testing on incoming batches of components, including intermediate steering shafts, to verify that the parts are free from defects and comply with its specifications, and convey any irregularities to TMS.  Accordingly, TMS knew or should have known that the intermediate steering

---

[8] *See* https://www.toyotanation.com/threads/diy-intermediate-steering-shaft-replacement.1001154/; https://www.toyotanation.com/threads/pop-in-steering-wheel-2008-base-highlander.358666/#post-3333517 (last accessed June 5, 2020).
[9] A copy of TSB No. 0296-08 is attached hereto as **Exhibit E**.

shafts used in Class Vehicles are defective and likely to break down, costing Plaintiffs and Class members thousands of dollars in repair or replacement.

104.  For all certified pre-owned vehicles, TMS and its affiliates conduct a "160-point minimum Quality Assurance Inspection, which includes mechanical, detailing and appearance standards. The inspection requires that factory-trained technicians complete any necessary repairs and reconditioning" before all certified pre-owned vehicles are sold.[10] Consequently, TMS knew or should have known that the intermediate steering shafts used in Class Vehicles are defective and likely to break down, costing Plaintiffs and Class members thousands of dollars in repair or replacement.

105.  TMC also regularly conducts audits of its products and, in an effort to streamline its auditing efforts, it established a Product Audit Department in 2010, so as to "prevent quality problems that affect customer safety … with the following three objectives: (1) Consolidate functions for conducting audits from the customer's viewpoint and prevent defects from reaching customers into a separate group from the development departments and thereby enhance these functions; (2) Centralize collection of customer complaints, requests, etc., to facilitate its evaluation, helping prevent recurrence; [and] (3) Strengthen functions that keep engineers and technicians working as a team to discover and identify any signs of problems in the development phase."[11] As a result of the Product Audit Department's efforts to centralize the collection of customer complaints and audit vehicles to prevent vehicle component failures, TMC became aware of the Steering Shaft Defect and provided this information to TMS in order to aid its investigation into and/or monitoring of the hundreds, if not thousands, of Class member complaints concerning the Defect.

---

[10] https://www.toyotacertified.com/160-point-inspection (last visited June 5, 2020).
[11] https://www.toyota-global.com/company/history_of_toyota/75years/data/automotive_business/products_technology/technology_development/performance/index.html (last visited June 5, 2020)

106.   Moreover, TMS also should have known of the Steering Shaft Defect due to the sheer number of reports of damaged intermediate steering shafts in Class Vehicles and the high number of replacement intermediate steering shafts being ordered by its authorized technicians and dealerships.

107.   TMS, in conjunction with TMC, tracks all services performed at all authorized dealerships, and promotes as much to consumers.[12] Thus, TMS is aware of any and all problems customers have encountered with their Class Vehicles, including the Steering Shaft Defect.

108.   On information and belief, TMS also interacts with its authorized service technicians in order to identify potentially widespread vehicle problems and assist in the diagnosis of vehicle issues.  TMS collects and analyzes field data including, but not limited to, repair requests made at dealerships and service centers, technical reports prepared by engineers that have reviewed vehicles for which warranty coverage is requested, parts sales reports, and warranty claims data, all of which alerted it to the Defect's existence.

109.   The timing of the aforementioned complaints, coupled with the other means through which TMS (and TMC, who conveys this information to TMS) monitors vehicle performance, clearly establishes that TMS had knowledge of the Steering Shaft Defect prior to the time of sale of all the Class Vehicles.

110.   Despite its longstanding knowledge of the Steering Shaft Defect, TMS did not disclose the Defect's existence to Plaintiffs or Class members, either in advertising, at the point-of-sale, or subsequent to purchase. TMS has not recalled Class Vehicle or even informed Class members of the Defect's existence and the serious and unjustifiable safety risks it imposes upon them.

///

///

///

---

[12] https://www.toyota.com/owners/my-vehicle/service-history (last visited June 5, 2020)

-33-

## CLASS ALLEGATIONS

111.   Plaintiffs bring this action on their own behalf, and on behalf of two state classes (collectively, the "Class") pursuant to Federal Rules of Civil Procedure, Rule 23(a), 23(b)(2), and/or 23(b)(3). Specifically, the California and Illinois Classes consist of:

**California Class**:

All persons or entities in California who are current or former owners and/or lessees of a Certified Pre-Owned 2008-2013 Toyota Highlander for primarily personal, family or household purposes, as defined by California Civil Code § 1791(a).

**Illinois Class**:

All persons or entities in Illinois who are current or former owners and/or lessees of a 2008-2013 Toyota Highlander purchased for primarily personal, family or household purposes.

112.   The California and Illinois Classes shall be collectively referred to herein as the "Class." Excluded from the Class are TMS, its affiliates, employees, officers and directors, persons or entities that purchased the Class Vehicles for resale, and the Judge(s) assigned to this case. Plaintiffs reserve the right to modify, change, or expand the various class definitions set forth above based on discovery and further investigation.

113.   Numerosity:  Upon information and belief, the Class is so numerous that joinder of all members is impracticable.  While the exact number and identities of individual members of the Class are unknown at this time, such information being in the sole possession of TMS and obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis alleges, that hundreds of thousands of Class Vehicles have been sold and leased in each of the States that are the subject of the Class.

114.   Existence and Predominance of Common Questions of Fact and Law: Common questions of law and fact exist as to all members of the Class. These questions predominate over the questions affecting individual Class members. These common legal and factual questions include, but are not limited to whether

a.   The Class Vehicles were sold with a Steering Shaft Defect;

b.   TMS knew of the Steering Shaft Defect but failed to disclose the problem and its consequences to its customers;

c.   A reasonable consumer would consider the Steering Shaft Defect or its consequences to be material; and

d.   Toyota's conduct violates California's Consumers Legal Remedies Act, California Unfair Competition Law, and the other statutes asserted herein.

115.   <u>Typicality</u>: All of Plaintiffs' claims are typical of the claims of the Class since Plaintiffs purchased Class Vehicles with the Steering Shaft Defect, as did each member of the Class.  Furthermore, Plaintiffs and all members of the Class sustained monetary and economic injuries including, but not limited to, ascertainable losses arising out of TMS' wrongful conduct.  Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all absent Class members.

116.   <u>Adequacy</u>:  Plaintiffs are adequate representatives because their interests do not conflict with the interests of the Class that they seeks to represent, they have retained counsel competent and highly experienced in complex class action litigation, and they intends to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

117.   <u>Superiority</u>:  A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and members of the Class.  The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by TMS' conduct.  It would be virtually impossible for members of the Class individually to redress effectively the wrongs done to them.  Even if the members of the Class could afford such individual litigation, the court system could not.  Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, an

economy of scale, and comprehensive supervision by a single court. Upon information and belief, members of the Class can be readily identified and notified based on, *inter alia*, TMS' vehicle identification numbers, warranty claims, registration records, and database of complaints.

118. TMS has acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

**FIRST CAUSE OF ACTION**
**VIOLATIONS OF THE CALIFORNIA BUSINESS AND PROFESSIONS CODE**
**CAL. BUS. & PROF. CODE § 17200**
**(By Plaintiff Drake on Behalf of the California Class)**

119. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at herein.

120. Plaintiff Drake brings this claim on behalf of herself and the California Class.

121. The California Unfair Competition Law ("UCL") prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

122. TMS has engaged in unfair competition and unfair, unlawful and/or fraudulent business practices by the conduct, statements, and omissions described above, and by knowingly and intentionally concealing from Plaintiff Drake and California Class members that Class Vehicles suffer from the Steering Shaft Defect (and the costs, safety risks, and diminished value of the vehicles associated therewith). TMS should have disclosed this information because it was in a superior position to know the true facts related to the Steering Shaft Defect, and Plaintiff Drake and California Class members could not reasonably have been expected to learn or discover the true facts related to the Defect.

123. The Steering Shaft Defect constitutes a safety issue that triggered TMS' duty to disclose the safety issue to consumers as set forth above.

124. These acts and practices are fraudulent because they have deceived Plaintiff Drake and are likely to deceive the public. In failing to disclose the Defect and suppressing other material facts from Plaintiff Drake and the California Class members, TMS breached

its duty to disclose these facts, violated the UCL, and caused injuries to Plaintiff Drake and the California Class members. The omissions and acts of concealment by TMS pertained to information that was material to Plaintiff Drake and California Class members, as it would have been to all reasonable consumers.

125.    The injuries suffered by Plaintiff Drake and the California Class members are greatly outweighed by any potential countervailing benefit to consumers or to competition, nor are they injuries that Plaintiff Drake and the California Class members should have reasonably avoided.  Therefore, TMS also has engaged in unfair practices.

126.    TMS' acts and practices also are unlawful because they violate California Civil Code sections 1668, 1709, 1710, and 1750 *et seq.*, and California Commercial Code section 2313.

127.    Plaintiff Drake seeks to enjoin further unlawful, unfair, and/or fraudulent acts or practices by TMS, to obtain restitution and disgorgement of all monies and revenues generated as a result of such practices, and all other relief allowed under California Business and Professions Code section 17200.

## SECOND CAUSE OF ACTION
### VIOLATIONS OF CALIFORNIA'S CONSUMERS LEGAL REMEDIES ACT ("CLRA")
### Cal. Civ. Code § 1750, *et seq.*
### (By Plaintiff Drake on Behalf of the California Class)

128.    Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

129.    Plaintiff Drake brings this cause of action for herself and on behalf of the California Class members.

130.    TMS is a "person" as defined by the CLRA. Cal. Civ. Code § 1761(c).

131.    Plaintiff Drake and California Class members are "consumers" within the meaning of the CLRA. Cal. Civ. Code § 1761(d).

132.    The purchases and leases of Class Vehicles by Plaintiff Drake and California Class members constitute "transactions" as defined by the CLRA. Cal. Civ. Code § 1761(e).

133.    The Class Vehicles constitute "goods" or "services" as defined by the CLRA. Cal. Civ. Code §1761(a) and (b).

134.    Plaintiff Drake and California Class members purchased or leased the Class Vehicles primarily for personal, family, and household purposes as meant by the CLRA. Cal. Civ. Code § 1761(d).

135.    TMS' representations, active concealment, failures to disclose, and omissions regarding the Class Vehicles violated the CLRA in the following ways:

   a.    TMS misrepresented that the Class Vehicles had characteristics, benefits, or uses that they did not have (Cal. Civ. Code § 1770(a)(5));

   b.    TMS misrepresented that the Class Vehicles were of a particular standard, quality, or grade when they were of another (Cal. Civ. Code § 1770(a)(7));

   c.    TMS advertised the Class Vehicles with an intent not to sell/lease them as advertised (Cal. Civ. Code § 1770(a)(9));

   d.    TMS misrepresented that the Class Vehicles and the warranties conferred or involved rights, remedies, or obligations that they did not (Cal. Civ. Code § 1770(a)(14)); and

   e.    TMS misrepresented that the Class Vehicles were supplied in accordance with previous representations when they were not (Cal. Civ. Code § 1770(a)(16)).

136.    TMS' unfair and deceptive acts or practices occurred repeatedly in TMS' course of trade or business, were material, were capable of deceiving a substantial portion of the purchasing public, and as a result, caused economic harm to purchasers and lessees of the Class Vehicles.

137.    TMS knew, by 2013 at the latest, and certainly before the sale or lease of the Class Vehicles, that the Class Vehicles' intermediate steering shafts suffered from an inherent defect, would fail repeatedly, and were not suitable for their intended use.

138.  By 2013 at the latest, TMS had exclusive knowledge of material facts concerning the existence of the Defect in its Class Vehicles. Furthermore, TMS actively concealed the Defect from consumers by denying the existence of the Defect to California Class members who contacted TMS about their intermediate steering shaft failures, and failing to provide an effective remedy for the Defect within a reasonable time under warranty.

139.  TMS was under a duty to Plaintiff Drake and California Class members to disclose the structurally deficient nature of the intermediate steering shafts, as well as the associated costs that would have to be repeatedly expended in order to temporarily address the failures caused by the Defect, because:

a.  TMS was in a superior position to know the true state of facts about the Defect in the Class Vehicles;

b.  Plaintiff Drake and California Class members could not reasonably have been expected to learn or discover that the Class Vehicles had the Defect until, at the earliest, the manifestation of the Defect; and

c.  TMS knew that Plaintiff Drake and California Class members could not reasonably have been expected to learn or discover the Defect prior to its manifestation.

140.  In failing to disclose the defective nature of the Class Vehicles, TMS knowingly and intentionally concealed material facts and breached its duty not to do so.

141.  The facts concealed or not disclosed by TMS to Plaintiff Drake and California Class members are material in that a reasonable consumer would have considered them to be important in deciding whether or not to purchase or lease a Class Vehicle. Moreover, a reasonable consumer would consider the Defect to be an undesirable quality, as Plaintiff Drake and California Class members did. Had Plaintiff Drake and other California Class members known that the Class Vehicles had the Defect, they would not have purchased or leased a Class Vehicle, or would have paid less for it.

-39-

142.    Plaintiff Drake and California Class members are reasonable consumers who did not expect their Class Vehicles to contain a defective intermediate steering shaft. It is a reasonable and objective consumer expectation for consumers to expect the intermediate steering shaft not to fail, thereby causing disruptive and disturbing noises to emanate from the vehicle, and in some cases, causing the vehicle to be unable to shift gears.

143.    As a result of TMS' misconduct, Plaintiff Drake and California Class members have been harmed and have suffered actual damages in that the Class Vehicles contain defective intermediate steering shafts that repeatedly fail to function due to the Defect, causing inconvenience, creating an uncomfortable and unhealthy environment for vehicle occupants, and causing California Class members to spend money to attempt to remedy the Defect.

144.    As a direct and proximate result of TMS' unfair or deceptive acts or practices, Plaintiff Drake and California Class members have suffered and will continue to suffer actual damages in that they have a Class Vehicle with a defective steering shaft.

145.    Plaintiff Drake and the California Class seek an order enjoining TMS' unfair or deceptive acts or practices and equitable relief under Cal. Civ. Code § 1780(e), and any other just and proper relief available under the CLRA.

146.    In accordance with section 1782(a) of the CLRA, on February 12, 2020, Plaintiff Drake's counsel, on behalf of Plaintiff Drake, served TMS with written notice of the alleged violations of Cal. Civ. Code § 1770(a) relating to the Class Vehicles purchased by Plaintiff Drake and California Class members, and demanded that TMS, within thirty (30) days of such notice, corrects or agrees to correct the actions described therein and agrees to reimburse Plaintiff Drake and California Class members' associated out-of-pocket costs.  TMS failed to fully, completely and timely comply with Plaintiff Drake's demand letter.

147.    Civil Code section 1780(a) provides that any consumer who suffers damage as a result of a violation of the CLRA may bring an action to recover: 1) actual damages, but in no case shall the total award of damages in a class action be less than $1,000; 2) an

order enjoining the methods, acts, or practices; 3) restitution of property; 4) punitive damages; and 5) any other relief that the court deems proper.

148.   Civil Code section 1781 provides that Plaintiff Drake may pursue this case as a class action.

149.   Plaintiff Drake requests injunctive relief pursuant to Civil Code 1782(d).

150.   Plaintiff Drake is entitled to attorney fees pursuant to Civil Code section 1780(e).

## THIRD CAUSE OF ACTION
### VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT
### 815 ILCS 505/1, *et seq*.
### (By Plaintiff Heslop on Behalf of the Illinois Class)

151.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

152.   Plaintiff Heslop brings this claim on behalf of himself and the Illinois Class.

153.   TMS is a "person" as that term is defined in 815 ILCS 505/1(c).

154.   Plaintiff Heslop and the Illinois Class are "consumers" as that term is defined in 815 ILCS 505/1(e).

155.   The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of trade or commerce . . . whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

156.   TMS participated in misleading, false, or deceptive acts that violated the Illinois CFA. By failing to disclose and actively concealing the dangers and risks posed by the Class Vehicles and/or the Defect, TMS engaged in deceptive business practices prohibited by the Illinois CFA.

-41-

157.   In the court of its business, TMS failed to disclose and actively concealed the Defect, and otherwise engaged in activities with a tendency or capacity to deceive.

158.   TMS also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression, or omission in connection with the sale of the Class Vehicles.

159.   TMS has known about the Defect since at least 2008, long before it issued a TSB concerning the Defect. Prior to selling the Class Vehicles, TMS knew or should have known about the Defect due to the rigorous testing that TMC and its manufacturing affiliates in the United States do that would have conveyed any irregularities to TMS. In addition, TMS was made aware of the Defect by numerous complaints made by consumers to both NHTSA and TMS directly.

160.   TMS failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defect.

161.   By failing to disclose and actively concealing the Defect in the Class Vehicles, by marketing them as safe, reliable, and of high quality, and by presenting itself as a reputable automobile dealer, TMS engaged in unfair or deceptive business practices in violation of the Illinois CFA.

162.   TMS deliberately withheld the information about the Defect and the propensity for the intermediate steering shaft to fail, in order to ensure that consumers would purchase the Class Vehicles.

163.   TMS also deliberately withheld the information about the Defect when Class members brought their Class Vehicles to TMS for repairs under the terms of their warranty, so that TMS would not have provide repairs free of charge, as required by its warranty.

164.   TMS' unfair or deceptive acts or practices, including the concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable

consumers, including Plaintiff Heslop, about the reliability of the Class Vehicles, the quality of TMS' brand, and the true value of the Class Vehicles.

165. TMS intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defect with an intent to mislead Plaintiff Heslop and the Illinois Class.

166. TMS knew or should have known that its conduct violated the Illinois CFA.

167. As alleged above, TMS made material statements about the safety and reliability of the Class Vehicles that were either false or misleading.

168. To protect its profits and avoid remediation costs and a public relations nightmare, TMS concealed the Defect, allowing unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles.

169. TMS owed Plaintiff Heslop and the Illinois Class a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defect because TMS:

      a. Possessed exclusive knowledge of the dangers and risks posed by the Defect;

      b. Intentionally concealed the Defect from Plaintiff Heslop; and/or

      c. Made incomplete representations about the safety and reliability of the Class Vehicles generally, while purposefully withholding material facts from Plaintiff Heslop that contradicted these representations.

170. Because TMS fraudulently concealed the Defect in Class Vehicles, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by TMS' conduct, they are now worth significantly less than they otherwise would be.

171. TMS' failure to disclose and active concealment of the dangers and risks posed by the Defect in Class Vehicles were material to Plaintiff Heslop and the Illinois Class. A vehicle made by a reputable manufacturer and sold by a reputable dealer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer and sold by a reputable dealer of unsafe vehicles that conceals defects rather than promptly remedies them.

172.   Plaintiff Heslop and the Illinois Class suffered ascertainable losses caused by TMS' misrepresentations and its failure to disclose material information. Had they been aware of the Defect, Plaintiff Heslop and the Illinois Class would have paid less for their vehicles or would not have purchased or leased them at all. Plaintiff Heslop and the Illinois Class did not receive the benefit of their bargain as a result of TMS' misconduct.

173.   TMS' violations present a continuing risk to Plaintiff Heslop as well as to the general public. TMS' unlawful acts and practices complained of herein affect the public interest.

174.   As a direct and proximate result of TMS' violations of the Illinois CFA, Plaintiff Heslop and the Illinois Class have suffered injury-in-fact and/or actual damage.

175.   Pursuant to 815 ILCS 505/10a(a), Plaintiff Heslop and the Illinois Class seek monetary relief against TMS in the amount of actual damages, as well as punitive damages because TMS acted with fraud and/or malice and/or were grossly negligent.

176.   Plaintiff Heslop also seeks an order enjoining TMS' unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under 815 ILCS § 505/1 *et seq.*

**FOURTH CAUSE OF ACTION**
**VIOLATIONS OF THE ILLINOIS UNIFORM**
**DECEPTIVE TRADE PRACTICES ACT**
**815 ILCS 510/1, *et seq.***
**(By Plaintiff Heslop on Behalf of the Illinois Class)**

177.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

178.   Plaintiff Heslop brings this claim on behalf of himself and the Illinois Class.

179.   Illinois' Uniform Deceptive Trade Practices Act ("Illinois UDTPA"), 815 ILCS 510/2, prohibits deceptive trade practices, including among others, "(2) caus[ing] likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services, … (5) represent[ing] that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do

not have …; (7) represent[ing] that goods or services are of a particular standard, quality, or grade … if they are of another, … (9) advertis[ing] goods or services with intent not to sell them as advertised; … [and] (12) engag[ing] in any other conduct which similarly creates a likelihood of confusion or misunderstanding."

180.    TMS is a "person" as defined in 815 ILCS 510/1(5).

181.    In the course of TMS business, TMS failed to disclose and actively concealed the Defect in Class Vehicles. Accordingly, TMS engaged in deceptive trade practices as defined in 815 ILCS 510/2, including representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that they are of a particular standard and quality when they are not; advertising them with the intent not to sell or lease them as advertised; and otherwise engaging in conduct likely to deceive.

182.    TMS intended for Plaintiff Heslop and the Illinois Class to rely on its aforementioned unfair and deceptive acts and practices, including the misrepresentations and omissions alleged hereinabove.

183.    TMS' actions as set forth above occurred in the conduct of trade or commerce.

184.    TMS' conduct proximately caused injuries to Plaintiff Heslop and the Illinois Class.

185.    Plaintiff Heslop and the Illinois Class were injured as a result of TMS' conduct in that Plaintiff Heslop and the Illinois Class overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of TMS' misrepresentations and omissions.

186.    Plaintiff Heslop seeks an order enjoining TMS' deceptive practices, actual damages, attorneys' fees, and any other just and proper relief available under the Illinois UDTPA per 815 ILCS 510/3.

///

///

///

-45-

SECOND AMENDED CLASS ACTION COMPLAINT

# FIFTH CAUSE OF ACTION
## FRAUDULENT CONCEALMENT
### (By Plaintiff Heslop on Behalf of the Illinois Class)

187.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

188.   Plaintiff Heslop brings this claim on behalf of himself and the Illinois Class under Illinois law.

189.   TMS concealed and suppressed material facts concerning the Class Vehicles.

190.   As described above, TMS made material omissions and affirmative misrepresentations regarding the Class Vehicles.

191.   TMS knew these representations were false when made.

192.   The vehicles purchased or leased by Plaintiff Heslop and the Illinois Class were, in fact, defective, unsafe and unreliable, because the vehicle was subject to the intermediate steering shaft failing.

193.   TMS had a duty to disclose that these vehicles were defective, unsafe and unreliable in that the vehicles were subject to the intermediate steering shaft failing, because Plaintiff Heslop and the Illinois Class relied on TMS' representations that the vehicles they were purchasing and retaining were safe and free from defects.

194.   The aforementioned concealment was material, because if it had been disclosed, Plaintiff Heslop and the Illinois Class would not have bought, leased, or retained their vehicles.

195.   The aforementioned representations were also material because they were facts that would typically be relied on by a person purchasing, leasing or retaining a new or used motor vehicle.

196.   TMS intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

197.   Plaintiff Heslop and the Illinois Class relied on TMS' reputation—along with its failure to disclose the intermediate steering shaft problems and TMS' affirmative

assurances that its vehicles were safe and reliable and other similar false statements—in purchasing, leasing or retaining the Class Vehicles.

198. However, TMS concealed and suppressed material facts concerning the culture of TMS—a culture that emphasized cost-cutting, avoidance of dealing with safety issues and a shoddy manufacturing process.

199. Further, TMS had a duty to disclose the true facts about the Class Vehicles because they were known and/or accessible only to TMS, who had superior knowledge and access to the facts, and the facts were not known to or reasonably discoverable by Plaintiff Heslop and the Illinois Class. As stated above, these omitted and concealed facts were material because they directly impact the safety, reliability and value of the Class Vehicles. Whether an automobile dealer's products are safe and reliable, and whether that an automobile dealer stands behind its products, is of material concern to a reasonable consumer.

<u>**SIXTH CAUSE OF ACTION**</u>
**UNJUST ENRICHMENT**
**(By Plaintiffs on Behalf of the Class)**

200. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

201. This claim for unjust enrichment is brought on behalf of the Class under California and Illinois law.

202. TMS has received and retained a benefit from the Plaintiffs and the Class, and inequity has resulted.

203. TMS benefitted while Plaintiffs, who originally overpaid for their Class Vehicles, were forced to pay additional out-of-pocket costs and incur additional expense and losses in connection with repairs.

204. It is inequitable for TMS to retain the benefits of its misconduct.

205. As a result of TMS' conduct, the amount of TMS' unjust enrichment should be disgorged, in an amount according to proof.

SECOND AMENDED CLASS ACTION COMPLAINT

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and members of the Class, respectfully request that this Court:

A.  determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying one or more Classes as defined above;

B.  appoint Plaintiffs as the representatives of the Class and their counsel as Class counsel;

C.  declare that TMS is financially responsible for notifying all Class members about the wrongful conduct set forth herein;

D.  grant appropriate injunctive and/or declaratory relief;

E.  award to Plaintiffs and the Class compensatory, actual, and exemplary damages, including interest, in an amount to be proven at trial;

F.  declare that TMS must disgorge, for the benefit of the Class, all or part of the ill-gotten profits it received as a result of the wrongful conduct set forth herein, or make full restitution to Plaintiffs and the Class;

G.  award Plaintiffs and members the Class any repair costs they are owed;

H.  award reasonable attorneys' fees and costs, as allowed by law;

I.  award pre-judgment and post-judgment interest;

J.  grant leave to amend the Complaint to conform to the evidence produced at trial; and,

K.  grant such further relief that this Court deems appropriate under the circumstances.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rules of Civil Procure, Rule 38(b), Plaintiffs hereby demand

///

///

///

-48-

SECOND AMENDED CLASS ACTION COMPLAINT

a trial by jury as to all claims so triable.

Dated:  January 22, 2021                     Respectfully submitted,

                                             **POMERANTZ LLP**

                                             By:_____
                                                   Jordan L. Lurie
                                                   Ari Y. Basser

                                             *Attorneys for Plaintiffs*

SECOND AMENDED CLASS ACTION COMPLAINT